GENERAL MAGNETIC COMPANY *v.* UNITED ELECTRICAL RADIO & MACHINE WORKERS OF AMERICA, LOCAL 937, CIO.

1. ASSOCIATIONS—PARTIES—INJUNCTION—DAMAGES.

　　Union of plaintiff's employees was a proper party defendant in suit for mandatory injunction to compel compliance with agreement, signed by plaintiff employer and the union, and prohibiting walkouts, but such union would be liable in damages only if responsible for the walkout upon which suit was based (CL 1948, § 612.12).

2. INJUNCTION—ARBITRATION—WALKOUT—EVIDENCE.

　　Conclusion that walkout of plaintiff's employees was the spontaneous decision of each individual employee, as claimed by defendants, the union, its president and some of the stewards, *held,* improper, from a consideration of defendants' testimony in suit for mandatory injunction to compel compliance with agreement between plaintiff and the union prohibiting lockouts by the employer and walkouts and other restriction of work previous to exhaustion of arbitration procedure set forth in the agreement.

3. ASSOCIATIONS—WORK STOPPAGE—STRIKE—BREACH OF CONTRACT.

　　Approval of a strike by union of employees following a work stoppage of 7 weeks' duration, affirmed union's past position and was of itself a violation of contract prohibiting walkouts or other restriction of work without having exhausted arbitration procedure set forth in agreement between employer and the union.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 31 Am Jur, Labor, §§ 198, 198.5, 295 *et seq.,* § 310.
[1, 3] Collective bargaining agreement as restricting right to strike.　2 ALR2d 1278.
[1, 3] Right to collective action under Section 7 of National Labor Relations Act as including right to strike.　6 ALR2d 435.
[5–7] 31 Am Jur, Labor, § 318.

4. SAME—WALKOUT—DAMAGES—EVIDENCE.

Evidence, presented in employer's action against union, its president and some of the stewards for breach of union's agreement not to stage a walkout, showed defendants were responsible for walkout and ensuing strike and rendered them liable in damages.

5. DAMAGES—BREACH OF CONTRACT—LOSSES—EVIDENCE.

Damages which may be awarded for the breach of an agreement between an employer and a union of its employees, like the breach of any other contract, are those reasonably contemplated by the parties and includes properly proved actual losses sustained and gains prevented by the breach.

6. SAME—LOSS OF PROFITS.

Alleged loss of profits during walkout of plàintiff's employees staged by defendant union, its officers and stewards, defendants herein, were too speculative to be allowed as an element of damages in employer's suit against union for breach of contract.

7. SAME—FIXED CHARGES—WALKOUT.

Damages of $3,000 a week for 11 weeks, for undisputed fixed charges of plaintiff employer during walkout of plaintiff's employees, staged by defendants in breach of contract with union.

Appeal from Wayne; Fitzgerald (Frank), J. Submitted June 15, 1950. (Docket No. 41, Calendar No. 44,714.) Decided October 2, 1950. Rehearing denied December 5, 1950.

Bill by General Magnetic Company against United Electrical Radio & Machine Workers of America, Local 937, CIO, and others for mandatory injunction requiring compliance with agreement and money damages. Cross bill by defendants against plaintiff to restrain lockout and compliance with contract. Decree for defendants. Reversed and decree for plaintiff entered.

*Clark, Klein, Brucker & Waples,* for plaintiff.

*Ernest Goodman,* for defendants.

BUSHNELL, J. Plaintiff General Magnetic Corporation, an Illinois corporation, doing business in Detroit, entered into a closed shop agreement with defendant United Electrical Radio & Machine Workers of America, Local 937, CIO, on April 15, 1946. After a strike in July, 1947, the contract was amended as to wages, but remained unchanged as to the other provisions. It was signed for the union by the negotiators, Charles Kelly, who is president of Local 937; Edward F. Risk, an employee of plaintiff, and chief plant steward; and J. H. Fortune and Guy Lewin, the latter being an employee and steward. Kelly, Risk and Lewin are defendants herein, as well as Arthur Fortune, another employee and steward.

Article 8 of the contract concerns grievance procedure and arbitration. Four levels of negotiation are required in settling differences and compulsory arbitration follows if all these fail. The time lost from work by union representatives in settling grievances is paid by the company. In addition, section 3 provides:

"It is specifically agreed between the parties hereto that there shall be no lockout by the company and there shall be no walkout, sit down, slow down, cessation, limitation or curtailment of production or restriction of work of any kind or for any cause or on account of any controversy whatsoever by any of the members of the union during the existence of this agreement, until the procedure above outlined shall have been completely exhausted. Any employee or employees who shall violate the terms of this paragraph shall be conclusively deemed to have voluntarily terminated their employment with the company and the company may at its discretion replace any such employees."

Article 11 reserves to the company the management of the business and the right to discharge employees for just cause.    All discharges are subject to the grievance procedure, and an employee unjustly discharged has to be reinstated with full pay and all former rights.

Plaintiff company was an exclusive manufacturer of small-sized permanent magnets for use in the radio industry.    The company was working one shift of about 38 employees 5 days a week.    The magnets were put through a grinding operation on a centerless grinder to bring them to accurate size. Thirty to forty thousand of these magnets had been rejected because the grinding operation pitted the magnet surfaces.    This was thought to be caused by improper cooling and various proportions of oil and water had been tried.    Working the company's only 2 centerless-grinding machines on 1 shift could not maintain current production and also replace the rejected material.    Because of this situation employees Bugar and Lapiccallo were assigned to work a second shift (3:30 p.m. to 12 midnight) on these machines.    They worked on this job during the week of November 17, 1947, with union consent.

On Friday morning, November 21st, Kelsey M. Bird, the engineer in charge of the grinding, informed the union that the extra work on the centerless grinders would require at least another week. On the same day Raymond B. Wilson, supervisor of the foundry, determined that extra molds were needed to get out the castings required for the following week.    Two molders and 2 molders' helpers were needed for this overtime work the next day, Saturday, November 22d.    When defendant Risk was so informed he stated that he should be one of the men. Although a grinder, he was offered work as one of the molder's helpers, but he declined to "bump" Brown, the union steward who had been assigned.

As chief steward, Risk claimed to be entitled to work in addition to the others. When told he could work Saturday only by substituting for one of the other 4, Wilson testified that Risk said: "If I don't work, nobody else works, and furthermore, you won't work Bugar and Lapiccallo, Monday afternoon." Risk was then told that the afternoon work on the centerless grinders was still necessary and that Bugar and Lapiccallo were the 2 men to continue on it the next week.

On Saturday the 2 molders and 1 of the molder's helpers came to work, but Brown, the steward, did not. Both Brown and Risk stopped by the plant Saturday and saw the other 3 at work. Risk said he couldn't understand this because he had talked to them after work the day before.

From Friday morning, November 21st, until Monday, there were numerous phone calls between the stewards, Kelly and others. Friday morning Risk called Kelly about working on Saturday. Kelly gave Risk certain instructions which he said at the trial that he could not remember, and Risk called back later. This call related to Bugar and Lapiccallo working the next week. On Saturday, Brown called Kelly about the work that day and Risk reported to Kelly that the other 3 had worked. Saturday night Risk and Lewin talked about these grievances. On Sunday, Brown called Risk, and then Arthur Fortune called him. Risk called Kelly that evening, brought him up to date about Brown and Lewin, and said the situation was "coming to a boiling point." Kelly told Risk he would be at the plant Monday morning.

Defendant Kelly arrived at plaintiff's plant about 6:45 a.m. Monday, November 24, 1947. Previously he had never been there prior to the beginning of the morning shift. He went in the door by the time clock and waited for the stewards to come to work,

especially for Risk. Bugar reported on the morning shift as directed by Kelly.

Kelly talked with Risk and Brown about their difficulties and had Risk call the employees together. As he started to address them the plant machinery started automatically at 7. Because of the noise, the group moved to the lunchroom. There, except for 1 question, Kelly did all the talking. Kelly testified that he did not inflame the men nor deliver an ultimatum. However, he reviewed the grievances of the past week and stated the union's position of having Bugar work on the 7 o'clock shift. Kelly mentioned that the company had been pushing people around and "creating more grievances than we had a right to have," and that there was more trouble there than at all the other Local 937 plants put together. He also said that "if the employees of the plant were not able to handle their own situation, then there was nothing left for the Local to do but for the Local to handle the situation for them." Risk testified that Kelly told the meeting that if they did not take care of things themselves, the Local would step in and he would do it himself.

The meeting lasted 15 or 20 minutes, after which all the employees, except the stewards, went to their machines. Kelly walked the short distance from the lunchroom to the plant door and turned around facing the interior of the plant to see what was developing. Bugar then walked up to Bird, Wilson and Barlow, and asked where he was to work. As on Friday, he was told to report at 3:30 that afternoon. Bugar then walked toward the stewards and talked to them. Stewards Risk and Lewin, with Bugar, approached Bird, Wilson and Barlow, and again demanded that Bugar be put to work immediately. Bird repeated his instructions. The stewards then approached Kelly where he stood with his back to the door, and conversed. He told them to tell Bird

and Wilson that Bugar was to go on the 7 o'clock shift. They returned to the management group, making some derogatory remarks about the grievance procedure, and then went back to Kelly. He sent them back a last time and walked out of the door. The men had now been back at their machines for 10 or 15 minutes, and Kelly had been standing at the door during this time.

When the stewards left Kelly, Bird and Wilson testified that they made swinging arm motions and called to the employees: "Come on, let's go." The stewards told the employees to get their hats and coats and get off their jobs. The stewards admitted walking around the plant and calling to some of the men, but denied it was to take them off work. Wilson testified that, as defendant Fortune was calling people out, Fortune told him, "It is time you fellows learned that we are running this business."

Kelly had walked about 30 feet toward his car when Risk called him back. He did not go back in the plant, but as the men gathered around him, he said there was no strike, and for them to go home and come back the next morning.

Ann Rumple, an employee, testified that Risk came to her department and said, "Come on, we are going home, they sent Mr. Bugar home." She testified that she "followed what he said and left," the others doing likewise. The stewards were the last to leave, and she saw Risk checking to see that everybody was going.

Kelly did not call a union meeting that day and had not previously considered it because it was outside working time. He saw no one connected with the management that day.

J. Roy Hoven, the chief engineer of the company, on Monday afternoon decided to discharge Risk, Lewin, Brown and Arthur Fortune for leading the walkout. Their discharge notices were posted on

the bulletin board near the time clock that evening.

When Risk, Lewin, Brown and Arthur Fortune returned to the plant on Tuesday morning about 7, they were handed their checks and dismissal notices. Kelly had arrived about 6:45 and waited for Risk in his parked car. Risk told him he had been discharged, and Kelly went in to look at the notice at about 7:15. The stewards laughed and treated their discharge as a joke. The employees who were there saw the stewards and Kelly and did not go to their machines. Kelly talked to the stewards and some of the employees, and the stewards mingled with the employees. No one went to work that morning and all left the plant within a short time.

Kelly then attended a morning conference with the company attorney, H. William Butler, at a meeting which had been previously scheduled to discuss pending grievances. Kelly took Risk with him and they discussed the walkout for about an hour. Kelly told Butler that the stewards were not to blame, but that he was, if anyone. A union meeting was held about noon that day, with Kelly discussing the walkout, the stewards' discharge, and his talk with Butler. The employees remained away from work all day.

On Wednesday the employees were solicited by telephone to return to their jobs. On November 27th a letter was mailed to the employees, enclosing a copy of the union contract and the no-walkout agreement, and requesting their return to work. This was repeated by another letter on December 3d, and further telephone requests. On December 9th plaintiff filed a bill of complaint, alleging a breach of the union contract and violation of the Federal labor-management relations act of 1947,[*] and asking injunctive relief and money damages.

---

[*] 29 USCA 1949 Cum Supp § 141 *et seq.*—REPORTER.

Defendants were ordered to show cause why a temporary injunction should not issue, and a temporary restraining order was granted. The company enclosed a copy of this order in its third letter of December 15, 1947, telling the employees that the strike was unlawful and that the union could not prevent their returning to work. A fourth letter was written them December 23, 1947, advising that, unless they returned to work by December 26th, they would be discharged. Those who did not return were discharged by letter on December 31st.

Since November 25th defendants had maintained watch on the plant. Kelly and Joseph Betwinas, the vice-president of the Local, parked in front of the plant several times. Eight union men appeared quite regularly. Lewin admitted he stopped at the plant 8 to 10 times either when a shift was going on or coming off. Risk similarly admitted sitting in his car at the plant at the morning or evening shift hours "pretty steady." He and Lewin had seen others. He met Arthur Fortune several times. Risk said Kelly and the other stewards were going there every day, and Risk chased 1 employee in his car.

The union called a meeting on December 11, 1947 and presented its position. On January 16, 1948, Kelly, Risk and others brought about 20 of the discharged employees to the plant and demanded their reinstatement. This was refused. On January 19th a strike vote was taken and a strike authorized. Thereafter a picket line was set up outside the plant and the usual incidents occurred.

Plaintiff began hiring new men during January, 1948, and by March 23d there were 28 at work, the minimum number for a full shift. Normal production of 40,000 to 50,000 pieces was attained by a shift of 21 employees during the first week of February. On February 13, 1948, the company terminated the union contract.

A temporary injunction was issued on December 30, 1947, restraining defendants from continuing the walkout, interfering with plaintiff's operations, its agents or employees, and from picketing. Defendants filed an answer and motion to dismiss on January 14, 1948, and in a cross bill charged the company with a lockout. A temporary restraining order was then issued against the company. Plaintiff answered the cross bill on January 23, 1948, and defendants replied on January 27, 1948. The cause was advanced before any decision was had on this or other motions, and the trial began April 20, 1948.

The trial judge resolved all fact questions in favor of defendants, found the union and its representatives not responsible for the walkout, and denied plaintiff any relief. A decree was entered dismissing both bills, and from this plaintiff appeals.

Section 3 of article 8 of the company-union contract fully and explicitly prohibited any sort of a work stoppage until the grievance procedure had been completely exhausted. A walkout of the employees was included within this prohibition. The union is a proper party to be sued (CL 1948, § 612.12 [Stat Ann § 27.664]; *United States Heater Co.* v. *Iron Molders' Union of North America,* 129 Mich 354), but it is liable only if responsible for the walkout.

Much of the evidence concerning the union's responsibility is conflicting. Even in this *de novo* hearing the Court does not readily substitute its opinion of the witnesses' testimony for that of the trial judge. Yet here the record challenges his conclusions.

A fair consideration of defendants' testimony in relation to their admitted actions does not warrant the conclusion that this walkout was, as defendants claim, the spontaneous decision of each individual employee.

Our examination of the record on appeal shows that—following the week-end conversations between the union stewards and officers, defendant Kelly arrived prior to the morning shift, something he had never done before. Bugar was there as Kelly had directed. In the meeting that morning, Kelly reviewed the grievances of the past week and insisted that Bugar was to work that morning. Nothing was said or done about the contract grievance procedure. It was consistently ignored. Kelly sent the employees back on the job, and then waited by the door to see what happened when Bugar followed his directions. Kelly conferred with the stewards immediately before the walkout occurred. He did not talk to the management.

Bird, Wilson and Ann Rumple testified specifically and unequivocally to the stewards' words and actions in directing the employees to leave work. Kelly was conversing with the stewards in the doorway until just before this occurred. Risk, Arthur Fortune and Lewin did not deny circulating through the plant. None of the stewards made any effort to prevent the employees leaving, nor did they try to persuade them to comply with the contract grievance procedure.

The employees who returned on Tuesday did not go to work. Kelly, although again there early, made no attempt to get them on the job. He talked with the stewards and the employees, and the result was that all of them went home.

After 7 weeks of their work stoppage a strike was approved by the union. This affirmed its past position and was of itself a direct violation of the contract.

The pattern of events and actions of the union and its authorized representatives, both before and after the walkout of November 24, 1947, contradicts their testimony and corroborates that of plaintiff's

witnesses. The union breached its contract, and it, as well as the individual defendants, is liable for the resulting damages.

The damages that should be awarded for breach of this contract, like breach of any other contract, are those reasonably contemplated by the parties. Under proper proofs this includes both the actual losses sustained and the gains prevented because of the breach. However, here the company had difficulty with its centerless grinders and was working on rejected material. Further, it was still recovering from the effect of a previous strike in July, and its books show net losses in the months preceding the November walkout. In such a situation the alleged loss of profits is too speculative. However, the company's operations were effectively hampered by the walkout until February of 1948, when normal production was resumed. The undisputed fixed charges of $13,000 per month or $3,000 a week will be allowed from November 24, 1947 until February 9th, a total of 11 weeks, *viz.*, $33,000.

Other questions presented are now moot.

The decree of the trial court is vacated and one may be entered here in conformity with this opinion. Costs to appellant.

BOYLES, C. J., and REID, NORTH, DETHMERS, BUTZEL, CARR, and SHARPE, JJ., concurred.