**UNITED ELECTRICAL, RADIO & MACHINE WORKERS OF AMERICA et al. v. OLIVER CORP.**

No. 14661.

United States Court of Appeals Eighth Circuit.

June 9, 1953.

Basil R. Pollitt, New York City (Kenneth J. Enkel, Minneapolis, Minn., David Scribner and Donner, Kinoy & Perlin, New York City, were with him on the brief), for appellants.

R. W. Zastrow and Boyd G. Hayes, Charles City, Iowa, for appellee.

Before SANBORN, JOHNSEN, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

The Oliver Corporation, engaged in the manufacture of tractors and other farm and industrial equipment in Charles City, Iowa, brought this action under the Labor Management Relations Act, 1947, in the United States District Court for the Northern District of Iowa against the United Electrical, Radio & Machine Workers of America (UE) and Local 115-F, United Electrical, Radio & Machine Workers of America (UE), labor organizations, charging the defendants with three separate breaches of a collective bargaining agreement to which the Company and the Unions were parties. The District Court directed a verdict in favor of the defendant Unions on the first count. Jury verdicts on the second and third counts were returned in favor of the plaintiff Company. Both Unions [1] appeal from the judgments entered on the jury verdicts.

The Pleadings [2]

In the complaint the Company charged in three counts that the Unions, the sole bargaining agency of the Company employees, except supervisory, office, and professional personnel, had caused three strikes of the Company's employees, members of the Local Union, in violation of the collective bargaining agreement. In Count II of the complaint the Company sought to recover damages alleged to have been sustained by it as the result of a strike from January 18 through January 24, 1951. In Count III it asked for the recovery of damages result-

---

1. In this opinion Local 115–F is sometimes referred to as the Local Union; the United Electrical, Radio & Machine Workers, as the International Union.

2. The original complaint in this case is an extreme example of prolixity and repetition in pleading, amplified and extended by five amendments to the original, each deleting paragraphs or parts of paragraphs in previous pleadings, amending or revising others, and substituting new paragraphs. In separate answers the defendants followed the example of the plaintiff, adding argument to prolixity, with three separate amendments to each separate answer. Such a departure from the Federal Rules of Civil Procedure, 28 U.S.C. A., requiring that averments of pleadings be simple, concise, and direct, is inexcusable.

ing from a strike beginning on January 26, 1951, and continuing in effect until the afternoon of February 11, 1951. The Company alleged that both strikes were caused by the Unions by or through their authorized agents, and were supported by the Company's employees who were members of the Local Union and within the bargaining unit for which defendants were collective bargaining agents; that each strike was in violation of Articles III and IV of the collective bargaining agreement in that prior to the strike none of the disputes between the Company and the Unions was presented to the Company or processed through the grievance procedure provided in the collective bargaining agreement, and because prior to the strikes no strike vote was taken pursuant to a bulletin placed on the plant bulletin boards to the effect that a strike vote would be taken; no strike vote was taken; and no bulletin was posted on the plant bulletin boards.

As to each strike the complaint alleged that "because of said unlawful strike in violation of said contract, and as a direct and natural result of such breach of contract, the plaintiff was required to pay its standby expense, overhead and fixed charges, costs and expenses of maintaining its plant properties, and that normal supervisory employees and other normal essential personnel were required to be maintained and paid by the plaintiff despite the lack of work occasioned by said strike; that all of such sums so paid by the plaintiff were a direct loss to the plaintiff and caused directly by said strike, and that by reason of the above plaintiff was damaged and sustained a direct loss as the result of said strike." Plaintiff in Count II claimed damages of $17,-961.13 and in Count III damages of $48,-761.40. The jury verdicts were for the amounts claimed.

Both defendants moved to dismiss the complaint on the ground of failure to state a claim against defendants or either of them upon which relief could be granted. In support of the motion the defendants asserted that it appeared on the face of the complaint that the damages claimed were not the direct result of a breach of the bargaining agreement on the part of defendants;

that the complaint failed to show that plaintiff did not cause or contribute to the alleged strikes, or to allege which of the defendants, if either, caused, directed, or participated in the strikes. The motion was denied and defendants filed separate identical answers.

In their answers defendants admitted that the plaintiff was an employer and that defendants' members working at plaintiff's plant were employees in an "industry affecting commerce." They admitted that they were the duly constituted bargaining agency of plaintiff's employees, except that they denied their representation of "any individual employees who acted on their own and not in conjunction with or authorized by" defendants. They denied that the strikes alleged in the complaint occurred or that they were caused by the defendants or caused or participated in by any of defendants' authorized representatives. They denied each charge of breach of the collective bargaining agreement on the part of either of defendants; and alleged that the strikes, if any, were caused by the plaintiff's refusal to comply with the grievance and arbitration procedures of the bargaining agreement, in that the plaintiff wrongfully declined to negotiate with defendants concerning grievances of employees or to submit the issues between the parties to arbitration. They denied that plaintiff suffered any damage by reason of either of the alleged strikes, and alleged that a written agreement between the parties of February 9, 1951, constituted an accord and satisfaction of all claims of plaintiff.

Defendants also applied to the court for an order requiring the plaintiff to produce for inspection by the defendants its books and records for the periods six months prior to and subsequent to the alleged strikes showing:

1. The production of tractors;

2. The number of tractors on hand at the beginning of the strikes and subsequent to the strikes;

3. All orders for tractors showing how and to whom the tractors were sold;

4. The schedule for the production of tractors;

5. The profits and losses in plaintiff's operations;

6. The material on hand for production in December, 1949 and 1950, January and February, 1950, and January and February, 1951;

7. The number of employees in a bargaining unit represented by defendants during the months last mentioned, and the records of absenteeism during the strike periods;

8. All correspondence relating to absenteeism of employees during the strike periods;

9. All correspondence relating to grievances involved in the alleged strikes;

10. The number of supervisory personnel employed during the same period, the names of salaried supervisory employees, the length of their employment and salaries, and office duties during the strike periods;

11. The operations of plaintiff's storage plant.

The motion was based upon the claim that the requested records would or might disclose information important in the defense of plaintiff's claim of damages. The motion was resisted by plaintiff on the ground that the information available from the inspection of the requested records related to matters not in issue between the parties and inadmissible in the trial of the action in defense of any of the issues raised by the pleadings.

The court ordered plaintiff to produce for defendants' inspection the records in requests numbered 1 and 2; to make available to defendants the records showing absenteeism of employees during the periods referred to in request numbered 7, the dates of the beginning of the last continuous employment of supervisory personnel mentioned in request numbered 10, and also the bills of lading and freight bills as a part of the records referred to in request numbered 11. Otherwise, the motion was denied.

It is admitted that the collective bargaining agreement was in force at all times material to the action. Originally executed by the parties on July 20, 1949, it contains revisions agreed upon at various times after execution, the last revision being made on December 6, 1950. It remained in full force and effect until July 20, 1952, and thereafter from year to year unless sixty days proir to any anniversary either party gave written notice to the other of its desire to terminate the contract. It was signed by the United Electrical, Radio & Machine Workers of America-UE, by Charles W. Hobbie, District President; by Local 115-F, by its President and by Leo Newman and two others, official capacities not stated; and by the Oliver Corporation by its plant manager and personnel manager. The provisions of the contract material in this action are:

"This Agreement is made and entered into this 20th day of July, 1949, by and between the United Electrical, Radio and Machine Workers of America-UE, on behalf of and in conjunction with its Local 115-F, (revised November 1, 1950) hereinafter referred to as the Union, and The Oliver Corporation, Charles City, Iowa, Plant Management, referred to hereinafter as the Company.

\* \* \* \* \* \*

"*Article III—No Strike—No Lockout*

"*Section 7.* During the life of this agreement, the Company will not cause any lockout (not including layoffs), nor will the Union cause any strikes, or cessations of work of any kind, until all the bargaining procedures as outlined in this agreement have been exhausted, and in no case on which an arbitrator shall have ruled, and in other cases on which an arbitrator is not empowered to rule until after negotiations have continued for at least seven (7) days at the last step of the grievance procedure, and until a strike vote has been taken in accordance with the Union's constitution, pursuant to a bulletin posted on the plant bulletin boards to the effect that the vote will be taken.

"*Article IV—Grievance Procedure*

"*Section 8.* Grievances or complaints with respect to wages, hours of work, or employment conditions, must be submitted in writing on regular

forms by the employee or the Union. Written answers shall be given to such grievances. They shall be taken up under the following procedure:

"*Step 1.*—By the affected employee, his Union representatives, or both, with his foreman, whose answer shall be given within one working day.

"*Step 2.*—By the affected employee, his Union representatives, or both, with his divisional superintendent, whose answer shall be given within three (3) working days.

"*Step 3.*—By the affected employee, his Union representatives, or both, with the Plant Manager, whose answer shall be given within five (5) working days after the meeting in which the grievance is presented to him.

"Should the Company desire to present a grievance to the Union, such grievance shall enter the grievance procedure at Step 3, which the Union shall answer within five (5) working days after such grievance is presented.

\* \* \* \* \* \*

"*Section 13.* All grievances involving interpretation or application of the terms of the collective bargaining agreement, not satisfactorily adjusted under the above grievance procedure shall, at the request of the party initiating the grievance, be submitted to an arbitrator, who shall be Clarence M. Updegraff for the duration of this agreement, for determination of final and binding arbitration, provided that the party requesting the arbitration shall notify the other party in writing of desire to arbitrate by the end of the tenth working day after the answer of the Plant Manager or the Union to such grievances at the third step of the grievance procedure is due as provided in Section 8 hereof. In the event Mr. Updegraff cannot continue to serve as arbitrator, Mr. N. P. Feinsinger will be named as his successor for the duration of this agreement. Each party waives the right to demand arbitration of grievances initiated by the other party. Not more than three grievances

may be arbitrated at one arbitration hearing.

\* \* \* \* \* \*

"*Section 14.* The arbitrator shall not have the power to add to, detract from or modify any of the terms of this agreement, or any agreement supplemental hereto, nor to pass upon any controversy arising from any demand of the Union for a general wage increase, or to establish or change piece rates, or the base rate of any job classification established by job evaluation."

During the period involved in this controversy and for several months before the alleged strikes occurred, Charles Hobbie was the official representative of the International Union for District 8, which included that part of Iowa in which the Company's plant is located, his duties being to direct organizational work in the District and to advise and assist the Local Union in its transactions with the Company. He was present and took part in the negotiations with the Company throughout the months of November and December, 1950, and January 1951. He actively participated in the meetings of the Local Union on January 18, 19, 21, 22, 23, and 28, 1951. He was also present at negotiations between the grievance committee of the Local Union and the Company on January 25 and 26, 1951, when the issues involved in the strikes of January 18 to January 25, 1951, and January 26 to February 11, 1951, were under discussion. At these meetings he acted as spokesman for the grievance committee.

Leo Newman, during all the time material to this action, was a chief steward, representing the slinger units of the Local Union in the plant foundry. Prior to 1951 he had been a member of the bargaining and grievance committees of the Local Union, regularly meeting with the Company representatives in negotiations concerning bargaining agreements. As chief steward of the slinger units he participated in grievance meetings between the Union and the Company involving grievances of the slingers. He held the position of sergeant at arms in the Local Union, and as chief steward for the slinger units appointed two sub-stewards to assist him in his work. It was

the duty of a chief steward and his assistants to represent the men in their units in presenting to the Company the grievances of the workers concerning rates of pay and other conditions of employment.

The Company's plant was operated five days a week, Monday through Friday, in three shifts of eight hours each with one-half hour in each shift for meals. There is evidence on the part of defendants that at a meeting in October 1950 the Local Union had voted to strike unless a number of grievances presented to the Company were settled. Apparently most, if not all, of these grievances were disposed of by the amendment to the contract adopted December 6, 1950. But at no time did either Union cause any bulletin to be posted on the Company's bulletin boards notifying the employees that a strike vote would be taken by the Local Union, nor was any such vote taken prior to the work stoppages beginning January 18 and January 26.

At the time of these work stoppages Don W. Harris was vice-president of District 8 of the International Union, and in his capacity attended and participated in the meeting of the Local Union on January 28, 1951. On January 19, 1951, Harris informed the Company that he had received a request from the Local Union to call a strike at the Company's plant and that such strike had commenced on January 18.

There was evidence that the work stoppage of January 18 to January 25, 1951, came about as follows. The slinger units in the foundry were dissatisfied with the rate of pay for Job HA1235B. They presented this grievance to their foreman through chief steward Newman, demanding a time study of the job and a revision of the rate. Pursuant to this request Job HA1235B was time studied on January 15. As a result of this time study the Company refused to change the piece rate on the job. On January 17 Newman told his foreman that the men refused to accept the result of the time study and if the slingers went out they would take the whole plant with them. On January 18 the slingers on the first shift, which began work at 7:30 A.M., notified their foreman that they would give the Company until 9:30 A.M. of that day to re-

time the job. The request was refused and at 9:30 A.M. the slingers quit work, closing the foundry.

The Company and the Union met in grievance negotiations on January 18. The Company refused to negotiate while the men were not at work, claiming a strike was in existence in violation of the collective bargaining agreement. On the same day a special membership meeting of the Local Union was held. The grievance committee recommended that instead of going to work on the following Monday, January 22, the employees attend a Union meeting at 7 A.M. of that day. Charles Hobbie was present, actively supporting this recommendation which was adopted by a vote of the members present.

Hobbie announced that there was to be a "panther hunt" and that the workers would not go to work but report at the Union Hall at 7 A.M. Monday morning. He instructed the members of the Union to tell their foremen that they would not return to work. On January 19, 1951, the Local Union published and distributed to its members more than a thousand copies of a bulletin notifying the members that, "Posse to hunt for the Black Panther will meet Monday morning at the Union Hall at 7 A.M.", and concluding with the injunction, "Join the Hunt." Leo Newman was also present at the meeting of January 18. He testified that he stayed away from work because of the "panther hunt", and that he told the men in the slinger units that they should not go to work but should join the "panther hunt." On January 22 a cage on a trailer bearing the sign, "Cage for the Black Panther", was placed near the plant entrance shortly before 7 A.M. Newman was present and told the men coming to work that they should join the "panther hunt."

On the following morning at a special meeting the Local Union adopted a resolution that the members work on days that the Company met with the grievance committee for negotiations and refuse to work on the days on which the Company refused to meet. On January 23 the Union voted to strike. On January 24 the plant manager reached an agreement with the Union

whereby the workers returned to work on January 25 and the grievance negotiations abandoned on January 18 were resumed. The employees returned to work on January 25 and this work stoppage ended.

The meeting between the Company and the Union on January 25, 1951, was devoted to a statement of the issues in dispute between the parties. Negotiations on these issues began on January 26 and lasted throughout the day. Charles W. Hobbie was present at these negotiations, taking a leading part. During the course of the meeting Hobbie presented two grievances of office employees who at that time were represented by Local 222-F as collective bargaining agent. Plant Manager Bird refused to consider grievances on behalf of office workers on the ground that Local 222-F was not represented at the meeting by its grievance committee. Bird insisted that grievances of the office workers be heard at a meeting with representatives of their bargaining agent. Hobbie insisted that if the meeting continued the grievances of the office workers must be considered. Bird refused, and the meeting adjourned. Hobbie announced that there would be no one at work on the second shift that afternoon, and on that afternoon a Local Union meeting was held at which its grievance committee and Hobbie reported the result of the meeting with the Company. The Union voted to strike. The strike commenced that day and continued until February 11, 1951. The Company refused to negotiate concerning grievances while the strike was in progress.

At the conclusion of all the evidence both defendants moved for a directed verdict on the ground that the work stoppage of January 18 to January 25 was not a strike or cessation of work caused by defendants, but was an unauthorized work stoppage by individual members of the Union, that there

was no evidence to show any breach of the bargaining agreement by either Union, and no evidence to show that the Company sustained any damage as a result of either strike, and further that the evidence showed there had been an executed accord and satisfaction between the parties with respect to any claims arising as a result of the strikes. Following the verdict of the jury the defendants moved for judgment non obstante veredicto and for a new trial assigning numerous errors in the rulings of the court. The motions were overruled. On this appeal the defendants question the jurisdiction of the District Court, the court's interpretation of the bargaining agreement, the court's charge, the sufficiency of the evidence to show a breach of the bargaining agreement or damage to the plaintiff, and the court's rulings on evidence.

 Little need be said of the attack on the jurisdiction of the District Court. This action was brought under section 301 (a) of the Labor Management Relations Act, 1947[3], 29 U.S.C.A., § 185(a), which authorized suits in the United States District Court for violation of contracts between an employer and a labor organization representing employees in an "industry affecting commerce."[4] Defendants say that section 301(a) creates no new substantive right or liability, and therefore this action is not one arising under the Constitution or laws of the United States. On this premise they contend the section is void as an attempt by Congress to extend jurisdiction of Federal courts beyond constitutional limits. Article III, Section 2, of the Constitution. This contention has been denied by every court which has considered it. The cases hold that in its labor legislation Congress, exercising its power under the commerce clause of the Constitution, not only intended to but did create substantive rights and liabilities of parties to collective

3. "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the

amount in controversy or without regard to the citizenship of the parties."

4. "Industry affecting commerce" means any industry or activity in commerce, or in which a labor dispute would burden commerce or tend to burden or obstruct commerce or the free flow of commerce.' 29 U.S.C.A. § 152.

bargaining agreements in industries affecting commerce. Textile Workers Union v. Arista Mills, 4 Cir., 193 F.2d 529; Shirley-Herman Co. v. International Hod Carriers, 2 Cir., 182 F.2d 806; Schatte v. International Alliance, 9 Cir., 182 F.2d 158; Bakery, etc. Union v. National Biscuit Co., 3 Cir., 177 F.2d 684; Pepper & Potter, Inc. v. Local 977, United Auto Workers, D.C., S.D., N.Y., 103 F.Supp. 684; Wilson & Co. v. United Packing-House Workers, D.C., S.D., N.Y., 83 F.Supp. 162; Colonial Hardwood Flooring Co. v. International Union United Furniture Workers, D.C., Md., 76 F.Supp. 493, affirmed 4 Cir., 168 F.2d 33.

Nor is this action beyond the jurisdiction of the District Court because of the arbitration provisions of the collective bargaining agreement and the Arbitration Act, 9 U.S.C. §§ 1–13. Section 3 of the Arbitration Act provides in substance that where any action is brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing, the court shall, on application of one of the parties to the agreement, stay the action until arbitration may be had in accordance with the terms of the agreement. The Act does not deny a Federal court jurisdiction of a controversy subject to arbitration. It grants to a party to an arbitration agreement the right to apply to the court in which the action is pending for an order staying proceedings in the action pending arbitration where the court finds that the issues in controversy are referable to arbitration under the agreement between the parties. The defendants did not apply to the District Court for a stay authorized by the Act.

Sections 13 and 14 of the bargaining agreement deal with arbitration of certain disputes between the parties. Under section 13 only the party initiating a grievance is granted the right to demand arbitration. Section 14 excludes from arbitration any dispute involving a change in a piece or base rate on a job classification, the sole issue between the parties which brought about the strike of January 18 through January 24. The same issue was involved with others in the strike beginning January 26. All issues in dispute in both strikes were initiated by the defendants who alone had the right to demand arbitration.

There was no error in the court's interpretation of the collective bargaining agreement. The introductory paragraph of the bargaining agreement recites that it is executed by and between the Company and the International Union "on behalf of and in conjunction with" the Local Union "hereinafter referred to as the Union." Section 7 of Article III of the agreement, the no strike article, binds the "Union" not to cause any strikes or cessations of work of any kind until the exhaustion of certain grievance and arbitration procedures set out in the agreement "and until a strike vote has been taken in accordance with the Union's constitution, pursuant to a bulletin posted on the plant bulletin boards to the effect that the vote will be taken."

Interpreting these provisions of the contract the District Court concluded that the obligations imposed upon the defendant Unions by the contract were several and not joint, and that the word "Union" as used in the no strike article referred to the Local Union. It is clear, as the court charged the jury, that the failure of the Local Union before a strike or cessation of work to post the required notice on the plant bulletin boards and take the required strike vote was a material violation of the agreement; that the International Union, as a party to the agreement in conjunction with and on behalf of the Local Union was at least bound not to cause, induce, or promote a breach of the Local Union's obligations under the agreement. It is equally clear in view of the bulletin posting and vote requirements of the agreement that the merits of the controversy between the Local Union and the Company were not questions for the jury; nor was the question whether the Company was itself guilty of a breach of the contract by its failure to comply with the grievance and arbitration procedures of the agreement. Shirley-Herman Co. v. International Hod Carriers, 2 Cir., 182 F.2d 806, 810; Compare Boeing Airplane Co. v. Aeronautical Industrial Dist. Lodge No. 751 of International Ass'n of Machinists, D.C., Washington, 91 F. Supp. 596, 603, 608.

■ Defendants' argument that the bulletin posting clause of the no strike article is meaningless and its admitted violation of no significance is frivolous. This argument is that the clause in question providing for a strike vote "in accordance with the Union's constitution" pursuant to a bulletin posted on the plant bulletin boards must be disregarded because the constitution of neither Union provided for the posting of bulletins or the taking of strike votes. Neither did the constitutions of the Unions, which are in evidence, prohibit either action. If this reference to the Union constitution is meaningless, it should be ignored in interpreting the agreement.

■ On Count II of the complaint involving an alleged strike from January 18 through January 24, 1951, the issues between the plaintiff and the Local Union submitted to the jury were whether the alleged strike occurred; and, if so, whether it was caused by the Local Union; and whether the strike resulted in damage to the plaintiff. The jury were told that if these issues were found in favor of plaintiff, then the issues on this count as against the International Union were whether Charles W. Hobbie induced or promoted the strike, and whether in so doing he was acting within the scope of his agency as an agent for the International Union, as well as the question of damages.

Under the evidence the issues submitted were for the jury. The work stoppage did begin by a walkout of the slingers not previously authorized by a vote of the Union, so far as the evidence goes, but on the afternoon of the walkout the Union met and voted not to return to work because of the grievance of the slingers. The Local Union took this action without posting the required notice on the plant bulletin boards. Under the contract the Company was entitled to reasonable notice that a strike vote would be taken. Since the strike ended as soon as the Plant Manager arrived at the plant, the fair inference from the evidence is that if the notice had been posted as required by the bargaining agreement this short strike might not have occurred.

■ Leo Newman was more than a mere representative of the slingers. As the chief steward he was the representative of the Local Union in charge of negotiations with the Company on behalf of the slingers. His representation of the slingers can not be disassociated from his representation of the Local Union. But whatever the scope of his agency the walkout of the foundry over the grievance of the slingers was promptly endorsed at a Union meeting. Calling the work stoppage which had been then started and which continued through January 24, with the approval of the Union, a "panther hunt" did not change its character, but only evidenced the bad faith of the Union. Charles W. Hobbie who had signed the contract as representative of the International Union was a sort of labor relations expert charged by the International Union with the duty of assisting and advising the locals in his district in relations with employers. In the discharge of the duties entrusted to him Hobbie was a representative of both the Local and the International. He, together with Leo Newman, was active in all the meetings of the Union during this work stoppage, in promoting the so-called "panther hunt," and in encouraging the interested Union members not to return to work. In view of the provisions of the Labor Management Relations Act, 1947, that in determining the responsibility of a labor organization for the acts of its agents the question whether the specific acts were authorized is not controlling, the question of the scope of Hobbie's agency, as well as that of Leo Newman, was for the jury. So also was the question of whether, within the meaning of the contract, the work stoppage involved in this count was caused only by the slingers acting independently or by the Unions.

In Count III of the complaint the only issue between the plaintiff and the Local Union submitted to the jury was the question of damages. As against the International Union the issues were the question of damages, the actions of Hobbie, and the scope of his agency. The instruction on this count of the complaint was not erroneous. The evidence shows without dispute that upon the termination of the grievance negotiations on the afternoon of January 26, the Union members went out on strike,

and their action was promptly ratified by a vote of the Union. Hobbie was present at this grievance meeting, acting in his usual capacity. Promptly when the meeting ended he announced that the strike would begin that afternoon.

In the introductory paragraph of the charge in which the court advised the jury of the nature of the action and directed the attention of the jury to the Federal statute under which it was brought, the court quoted the Labor Management Relations Act, 1947, as follows:

"Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets."

The objection to this part of the charge is based upon the supposition that it may have induced the jury to return a judgment against the defendants which it might not have returned if left in ignorance of the provisions of the Act under which the suit was brought. "It is not error for a Court to briefly state to the jury the statutory law upon which an action is based and then to point out the specific provisions of the Act which are being invoked in the cause on trial." Terminal R. Ass'n of St. Louis v. Fitzjohn, 8 Cir., 165 F.2d 473, 480, 1 A.L.R.2d 290. The court's charge must be considered as a whole in determining whether a particular statement is prejudicial. Considering the court's charge in its entirety, we conclude that it is not subject to any of the criticisms directed against it by the defendants. The merits of the controversy between plaintiff and defendants which brought about the strikes were not in issue in this action for damages for breach of contract. Whatever the merits of the controversy, defendants were obligated by the terms of the contract not to cause a strike or cessation of work until after posting a notice of intention to strike on the plant bulletin boards and until after the Union had voted to strike pursuant to the notice. The evidence does not establish the defendants' contention that the plaintiff violated the arbitration or grievance procedures of the contract before the strikes occurred. There is no evidence of a settlement of the plaintiff's claim for damages for breach of contract by an accord and satisfaction between the parties, and no evidence to show the failure of plaintiff to mitigate the damage caused by the strikes.

Plaintiff sought to recover as damages the necessary expenditures incurred by it during the period of the strikes and for which it received no return in productive labor. These expenses were fixed overhead charges, including the expense of maintaining the plant, the salaries of supervisory and professional employees and other essential personnel necessarily retained by the Company while the strikes were in progress, property insurance, property taxes, compensation and group insurance, social security taxes, and employees pension liability.

Plaintiff's evidence to establish its standby expense may be summarized. Overhead expense is the necessary cost incurred by a company in its operations which can not be easily identified with any individual product and which by accepted cost accounting procedure is spread over or allocated to the productive labor, which is labor performed in the processing of the company's products. Such expenses do not fluctuate directly with plant operations. They are expenses necessary to keep the company on a going concern basis and are based upon the company's production which is planned for a year in advance. They are constant regardless of fluctuations in plant operations. When productive labor in a plant is reduced for any period to less than the normal, the company sustains a loss in the expenditure of necessary overhead for which it receives no production. During the periods of the strikes the productive labor in the plant was 52½ per cent of normal. Since during the periods in question the Company received only 52½ per cent of normal production of the plant while at the same time compelled to incur its standby overhead expenses, the jury might in all the circumstances find that its loss amounted to 47½ per cent of the overhead, for which no return was re-

ceived in the form of productive labor. This loss on plaintiff's computation was $51,379.32. In addition plaintiff offered evidence to show a loss in expense for power and light purchased but not usable because of the interruption of operations due to the strikes amounting to $5,062.06, and for expenses of $11,851.90 for storage of products and material outside the plant made necessary by reason of the strikes. The total of all losses claimed for the three strikes was $68,293.28. The jury verdicts on Counts II and III were for that part of this loss which plaintiff's evidence attributed to the strikes involved in those counts.

On the question of damages the court charged the jury as follows:

"You will first determine the fair and reasonable amount of plaintiff's reasonably necessary fixed or standby overhead at or reasonably near the time of the violation of agreement upon which such Count is based. In making such determination you should determine what items of expenses were reasonably and properly allocable to such overhead and the fair and reasonable amounts of such allocable items. In making such determination you will exclude any items of overhead not reasonably necessary and any items of expense not properly allocable to such overhead.

"You will next determine what deprivation or loss of benefit, if any, of such reasonably necessary overhead may reasonably and fairly be considered as arising naturally from the particular breach of agreement involved and which may reasonably be supposed to have been in the contemplation of the parties at the time the agreement was entered into in the event of such violation. The amount of such deprivation or loss of reasonably necessary overhead as thus determined will constitute your award of damages for the

violation of agreement in either Count."

Defendants do not question the rule that the measure of damages recoverable for a breach of contract is the actual loss sustained as the direct result of the breach. They offered no evidence to question plaintiff's cost accounting practices or to show that the standby overhead expenditures of the plaintiff were not made or, if made, were unnecessary; or to show that the expense of storage facilities and for power and light was unreasonable or not incurred. They do not dispute plaintiff's evidence that during the periods of the strikes the productive labor received by the Company in connection with its overhead expenses was only 52½ per cent of normal. They admit, as was held in General Magnetic Corp. v. United Electrical Radio & Machine Workers of America, 328 Mich. 542, 44 N.W.2d 140, 144, an action for damages for the breach of a no strike clause of the collective bargaining agreement, that plaintiff in this case would be entitled to recover its necessary standby overhead expenses if the plant had been completely closed by the strikes. But they contend that since the plant was not completely closed no loss has been established.[5]

In substance defendants' contention is that on the facts in this case plaintiff's damage is to be measured only by the profits lost as a direct result of the strikes. Since the strikes did not completely stop all operation of plaintiff's business, the argument is that any loss to the Company in the way of expense incurred during the periods of the strikes was recouped or recovered through profits made by partial operation during the strikes and full operation of the plant after the strikes were over. To support this contention defendants asked the court to order plaintiff to produce its profits and loss accounts both before and after the strikes, and the records of the sales during the strikes. The District Court was right in denying these

5. As to overhead expenses without production see International Union of Operating Engineers v. Dahlem Construction Co., 6 Cir., 193 F.2d 470, 472; and as to overhead cost accounting, Gordon Form Lathe Co. v. Ford Motor Co., 6 Cir., 133 F.2d 487, 500; and Pacific Portland Cement Co. v. Food Machinery & Chemical Corp., 9 Cir., 178 F.2d 541, 555.

requests for, conceding that the plaintiff may have been able to make some profit from its operations during the periods of the strikes and after they were over, the jury might still find that those profits, if any, had been reduced by the amount of the loss caused directly by the strikes. That loss was caused by defendants' breach of the contract. That plaintiff in spite of the loss was able to continue a profitable operation would not show that the loss did not occur.

Implicit in defendants' contention is an admission of the fact of damage to the plaintiff. Their objection goes only to the method by which the amount of plaintiff's damage is computed. In determining the amount of an admitted damage mathematical accuracy is not required of juries. It is sufficient that a reasonable estimate based on relevant factors is reached. A jury may not render a verdict based on speculation or guesswork, even where the defendant by his own wrong has precluded a more precise computation of damages. "But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances 'juries are allowed to act on probable and inferential as well as (upon) direct and positive proof.'" Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652.

In this case the jury were entitled to infer that plaintiff sustained some damage as the result of the breach of the contract. They were given pertinent data upon which to compute the amount of plaintiff's damage. They were instructed in computing the amount of the damage to determine the fair and reasonable necessary standby expense at the time of the breach of the contract, to exclude such items of expense claimed by the plaintiff as the jury found unreasonable or unnecessary, and to allow only such expenditures as the jury found to arise naturally from the breach of the contract and which were within the contemplation of the parties at the time the contract was made.

Plaintiff moved to dismiss this appeal on the ground that the printed record filed by the defendants failed to comply with the Rules of this Court. The printed record does not contain a clear and connected narrative statement of the evidence. But that deficiency has been supplied to some extent by plaintiff's supplemental record. The motion to dismiss the appeal is denied. Defendants are taxed the cost of printing the supplemental record.

The judgment appealed from is affirmed.