**UNITED CONSTRUCTION WORKERS and United Mine Workers of America, Appellants,**

v.

**HAISLIP BAKING COMPANY, a Virginia Corporation, Appellee.**

No. 6951.

United States Court of Appeals Fourth Circuit.

Argued April 18, 1955.

Decided June 13, 1955.

Stuart B. Campbell, Wytheville, Va., and M. E. Boiarsky, Charleston, W. Va. (Stuart B. Campbell, Jr., Wytheville, Va., on brief), for appellants.

Robert T. Winston, Jr., and Wm. T. Bowen, Norton, Va. (Greear, Bowen, Mullins & Winston, Norton, Va., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal in an action under section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185(a), to recover damages for alleged breach of a collective bargaining contract. The plaintiff is the Haislip Baking Company, a corporation of Norton, Virginia, and the defendants are the United Construction Workers and the United Mine Workers of America. The case was heard before a jury which returned a verdict for plaintiff in the sum of $462,611.53. On motion of defendants for judgment n.o.v. or for a new trial, the judgment n.o.v. was denied but a partial new trial awarded, which was limited to damages sustained by plaintiff "by being obliged to liquidate its business". On the new trial thus granted, the jury answered the interrogatory as to damages in the sum of $165,000; and from judgment for plaintiff in this amount, the defendants have appealed. The principal questions presented by the appeal are whether verdict should have been directed for defendants and whether the verdict rendered on the first trial should not have been set aside in its entirety for manifest bias and prejudice on the part of the jury.

Plaintiff began operating a bakery in Norton in 1939 with an initial investment of less than $20,000. Its business grew and prospered during the war years and in 1948 it greatly enlarged its plant, purchased new machinery and began doing business on a much larger scale, but its books showed a loss for the year 1949 and the portion of the year that it operated in 1950. In the latter year, its books showed total assets of $336,776.70 with total liabilities other than capital stock of $211,156.38 or a net worth of $125,620.32. In 1949 it entered into a collective bargaining contract with the United Construction Workers, a division of District 50, which was itself a branch or division of the United Mine Workers of America. The contract was signed by the Construction Workers as affiliated with the Mine Workers. The contract was renewed in April 1950, but a wage increase for which it provided was postponed until June of that year because of the financial condition of plaintiff.

On May 29, 1950 a strike occurred at the bakery because two employees were discharged for unexplained absence on the preceding day. There is no evidence and no contention that either of the defendants instigated, encouraged or had anything to do with this strike in its inception. Plaintiff's officials called on one Morris, Regional Director of the Construction Workers and Belcher, its field representative, to assist in getting the men back to work and both came to the bakery on May 30 where they conferred with Fred Haislip, Sr., plaintiff's president, Fred Haislip, Jr., its general manager, and Fred B. Greear, its attorney, and a number of representatives of employees. After some discussion, the Haislips and Greear withdrew from the meeting so that Morris and Belcher could confer with the employees. They did confer and there is evidence that Belcher advised the men to go back to work without insisting on the reinstatement of the discharged employees but that they voted that they would not do so but would return to work only if the discharged employees were reinstated.

When the Haislips and Greear returned to the conference, Morris stated

that the men would return to work at once if the discharged employees were put to work, and that the question of plaintiff's right to discharge them would be arbitrated under the provisions of the collective bargaining agreement. Haislip, Sr. agreed that the plaintiff's right to discharge the two men might be referred to arbitration, but declined to put them to work in the meantime, saying that this would be a violation of the contract. Upon his persisting in this position, Morris withdrew, saying that he would not discuss the contract. As he withdrew Haislip, Sr. stated "You are putting us out of business, and we will hold you responsible." There is also evidence that, as Morris left the meeting, one of the employees asked him when they were going back to work and that he replied "You will go back to work when I tell you to and not before"; but this was after they had voted not to return to work unless the discharged employees were reinstated and after the conference had broken up because of Haislip's insistence that he would not reinstate them. There is no evidence that at this, or any other time, either Morris or Belcher attempted to prevent their returning to work and the evidence is that Belcher advised them to return to work without insisting on the reinstatement of the discharged employees and, after the vote was taken, told them they had made a mistake.

There is no evidence of any further effort on the part of plaintiff to operate the bakery or to negotiate with defendants. A meeting of the employees was called by Belcher for the following day at Dorchester, which is two and one-half miles from Norton and is the place at which the local union had its meetings. At this meeting it was decided by the employees to return to work without requiring the reinstatement of the two who had been discharged, and immediately after the meeting Belcher went to the office of Greear, the attorney, to notify him of the action taken. At that time, although it was on the day immediately following the meeting at the bakery, Hai-

slip, Sr. had returned to Logan, W. Va. and Haislip, Jr., the manager of the business, had gone to Florida on a fishing trip. Greear showed Belcher a copy of a letter which he had written that morning addressed to Belcher, Morris and one Starnes, the president of the local union, which he had written at the direction of Haislip and which was signed by Greear as "Attorney for Haislip Baking Company". That letter was as follows:

"Due to the fact that the members of Local Union ...... of the United Construction Workers has refused to abide by the terms of its contract with the Haislip Baking Company in defiance of the specific instructions of the Regional Director of the Union and its local field representative, and have thereby, through their present wildcat strike, destroyed the business of the Haislip Baking Company so that its customers have necessarily turned to other baking companies for their supplies, the Haislip Baking Company has decided that it will not be possible to operate the Bakery at a profit in the future. Accordingly, I am directed to advise that the Haislip Baking Company has gone out of business. All of the employees of the Company may call at the Company's office between 11:-00 a.m. and 12:00 noon on Saturday, June 3, 1950, at which time they will receive any and all wages due them to the date on which they quit."

Belcher testified that he told Greear of the action of the employees in the Dorchester meeting at the same time he was shown the letter. Greear says it was two days later that he was told. Which is correct is not important, nor is it important whether the Haislips learned of the results of the Dorchester meeting, although it is inconceivable that they should not have learned of it promptly. The important fact is that immediately following the meeting on May 30, plaintiff went out of business and so notified the officers of the union, without making any further attempt to reach an agreement with the employees or to minimize the damages

resulting from their action. Certainly damages resulting from such a precipitate closing out of business could not reasonably have been within the contemplation of the parties upon entering into the contract upon which plaintiff relies. It is a most pertinent circumstance, as bearing upon the bona fides of plaintiff's claim, that action was not instituted until more than two years after the occurrences now relied upon as constituting breach of contract and giving rise to the damages claimed.

The collective bargaining agreement does not contain a "no strike" clause. It does, however, provide for the handling of grievances by a procedure which it outlines with provision for arbitration, if this procedure does not result in a settlement of differences within 7 days. Another provision is that this procedure, or collective bargaining, shall furnish the exclusive method of settling disputes and grievances.

That section is as follows:

"The contracting parties agree, that as a part of the consideration of this agreement, any and all disputes, stoppages, suspensions of work, and any and all claims, demands or actions growing therefrom or involved therein shall be by the contracting parties, settled and determined exclusively by the machinery provided in the 'Settlement of Disputes', in Articles IX and X of this agreement, or by the full use of free collective bargaining as heretofore known and practiced."

Plaintiff's contention is that, even though the contract did not contain a no strike clause, it constituted a breach for employees to strike on account of a grievance, such as the discharge of the two employees, instead of handling same through the grievance procedure and arbitration, as the contract provided. The District Judge so held and held also that the strike here amounted to a breach of the contract by the local union. He submitted to the jury the question as to whether the defendants became liable for

the breach through participation in the strike by their agents Morris and Belcher. His charge with respect thereto is as follows:

"Article XVI, which I have previously read to you, specifically obligates the parties to settle and determine such a dispute 'exclusively by the machinery provided in the' contract. It was, therefore, the duty of the Union to settle the dispute growing out of the suspension or discharge of Hensley and Walters, as provided in the contract; and the action of the local union in striking and continuing to strike, instead of settling the dispute as they were obligated to do under the contract, constitute a breach of the contract. For this breach of contract, I charge you that the local union would be liable. However, the local union is not being sued in this action. This suit is against the United Construction Workers and the United Mine Workers of America. These defendants would not be liable unless their agents Morris and Belcher, after learning of it, one or both of them, participated in, ratified or encouraged the continuance of the strike. If you believe from a preponderance of the evidence that on May 30, 1950, Morris and Belcher, either or both agents of the defendants, acting within the scope of their authority, participated in, ratified or encouraged the continuation of the strike, in violation of the contract, you should find for the plaintiff; on the other hand, unless you believe from a preponderance of the evidence that Morris and Belcher, either or both, agents of the defendants, acting within the scope of their authority, participated in, ratified, or encouraged the continuation of the strike, in violation of the contract, you should find for the defendants."

We think that this passage of the charge stated the applicable law correctly. It is argued that a strike could not constitute a breach of a contract which did

not contain a no strike clause; but we think it clear that the purpose of the contract was to require the settlement of disputes and grievances by a procedure which would not cause the disruption of business that would necessarily result from a strike and that a strike without following such procedure was necessarily a breach. See Hazel-Atlas Glass Co. v. N. L. R. B., 4 Cir., 127 F.2d 109; 31 Am. Jur.1954 Cum.Supp. p. 174, sec. 198.5, note 2 A.L.R.2d p. 1287 and cases there cited. It is argued also that the right to strike without becoming guilty of breach of the contract is preserved by the language which prescribes "the full use of free collective bargaining as heretofore known and practiced", as an alternative to the use of the grievance procedure and arbitration prescribed by the contract. Collective bargaining, however, has the well understood meaning in the law of settling disputes by negotiation between employer and the representative of the employees. See Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; N. L. R. B. v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632; 7A Words & Phrases, Collective Bargaining, pp. 245–248, and cases there cited. When we enter orders directing parties to bargain collectively, we are certainly not directing anyone to strike.

■ Exceptions were taken to this portion of the charge on the ground that there was no evidence to support a finding that either Morris or Belcher participated in, ratified or encouraged the continuance of the strike, or that what they did or did not do with respect thereto was authorized by or was otherwise binding upon the defendants. We think that these exceptions were well taken and that for the same reason the defendants' motion for directed verdict should have been granted. What we are dealing with is, not a case where circumstantial evidence points to instigation of a strike by defendants or the agents who represented them, but a "wild cat" strike of local origin, without anything to suggest that defendants or their agents had anything to do with bringing it about. Morris and Belcher were called in to try to end the strike and get the men to go back to work, and everything that they did was directed to that end. Even if the testimony as to their advising the men to go back to work be disregarded and it be assumed that they did nothing of the sort, there is no evidence to support the view that they adopted the strike, that they encouraged it or that they prolonged it.

■ The real question in the case is whether the defendants, because of entering into collective bargaining agreements with plaintiff requiring that grievances be settled pursuant to the procedure provided by the contract, are liable for damages caused by a "wild cat" strike entered upon on account of such grievances by local employees, but without the authorization or sanction of the defendants. We think that this question must be answered in the negative. The local union was liable because the strike, although informally commenced, unquestionably had the approval of the local union; but this was not true of the defendants.

There is nothing in the contract making defendants liable for "wild cat" strikes or requiring that they take any action with regard to them. This court has pointed out that employees who engage in "wild cat" strikes lose the protection of the Fair Labor Standards Act and may be discharged by their employers with impunity for so doing. N. L. R. B. v. Draper Corporation, 4 Cir., 145 F.2d 199, 156 A.L.R. 989. We have never held, however, that there is any responsibility on the part of a union for a strike with which it has had nothing to do; and there manifestly is no such liability. If Morris and Belcher had done nothing when plaintiff called on them to help get the men back to work, there would have been no liability on the part of the defendants. This being true, defendants were not rendered liable by the efforts which these men made to bring about an adjustment of the difficulty, even if they did not do everything that they might have done to that end. The question is not whether they did everything

they might have done, but whether they adopted, encouraged or prolonged the continuance of the strike. There is no evidence of any sort that they did.

■ We think, also, that there is no showing of either express or implied authority on the part of either Morris or Belcher to adopt on the part of defendants a "wild cat" strike of this character. It must be borne in mind that the strike did not arise out of organizational or other activities in which defendants had an interest and in which their representatives might be held to have implied authority to participate in protection of that interest. Cf. United Mine Workers of America v. Patton, 4 Cir., 211 F.2d 742. It arose out of a grievance having no relation to organization or the interests of the defendants. It is hardly conceivable that authority to adopt, to participate in or to encourage such strikes, which are clearly inimical to the interests of a union, should be vested in field officers or regional directors. We find nothing in the record to justify a finding that either Morris or Belcher had such authority.

■ Section 301(b) of the Labor Management Relations Act, 29 U.S.C.A. § 185(b), provides that labor organizations shall be bound by the acts of their agents; and section 301(e) provides that, in determining whether any person is acting as agent for such organizations "the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." As pointed out by Senator Taft, however, the purpose of these provisions was merely to apply the ordinary rules of the law of agency to labor organizations, notwithstanding resolutions on their part disclaiming responsibility for the action of persons who, in reality, are acting in their behalf. In his analysis of the bill which ultimately became the Labor Management Relations Act, he made the following statement to the Senate, 93 Cong.Record p. 7001, Legislative History of Labor Management Relations Act vol. 2 p. 1622, viz.:

"Section 2(2), 2(13), and 301(e): The conference agreement in defining the term employer struck out the vague phrase in the Wagner Act 'anyone acting in the interest of an employer' and inserted in lieu thereof the word 'agent'. The term agent is defined in section 2(13) and section 301(e), since it is used throughout the unfair labor practice sections of title I and in sections 301 and 303 of title III. In defining the term the conference amendment reads 'the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.' This restores the law of agency as it has been developed at common law.

"These amendments are criticized in one breath as imposing too harsh a liability upon unions for the acts of their officers or representatives and as too mild with respect to the liability of employers for the acts of their managerial and supervisory personnel. Of course, the definition applies equally in the responsibility imputed to both employers and labor organizations for the acts of their officers or representatives in the scope of their employment.

"It is true that this definition was written to avoid the construction which the Supreme Court in the recent case of United States against United Brotherhood of Carpenters placed upon section 6 of the Norris-La Guardia Act which exempts organizations from liability for illegal acts committed in labor disputes unless proof of actual instigation, participation, or ratification can be shown. The construction the Supreme Court placed on this special exemption was so broad that Mr. Justice Frankfurter, speaking for the dissenting minority, pointed out that all unions need do in the future to escape liability for the illegal actions of their officers is simply to pass a standing resolution

disclaiming such responsibility. The conferees agreed that the ordinary law of agency should apply to employer and union representatives. Consequently, when a supervisor acting in his capacity as such, engages in intimidating conduct or illegal action with respect to employees or labor organizers his conduct can be imputed to his employer regardless whether or not the company officials approved or were even aware of his actions. Similarly union business agents or stewards, acting in their capacity of union officers, may make their union guilty of an unfair-labor practice when they engage in conduct made an unfair-labor practice in the bill, even though no formal action has been taken by the union to authorize or approve such conduct."

It is argued that it was the duty of Morris and Belcher as representing the union to consent to arbitration under the contract of the grievance which had arisen. So it was; but the evidence shows that they were willing to consent to arbitration and proposed it. The trouble was that arbitration would not stop the "wild cat" strike unless the discharged employees were put back to work. The striking employees had voted not to return to work unless this was done, and plaintiff was not willing to put them back to work, and so the strike continued. Defendants cannot be held to liability under such circumstances unless under their contract they are liable for strikes which they have not authorized and do not sanction; and we cannot find any such liability in the contract.

For the reasons stated, the Court is of opinion that verdict for the defendants should have been directed and that their motion for judgment n.o.v. should have been allowed. The Court is also of the view that, even if this were not so, the verdict should not be allowed to stand. The verdict on the first trial was so excessive and so manifestly based upon improper considerations, instead of upon the record, that it should have been set aside in its entirety and a complete new trial ordered. See Ford Motor Co. v. Mahone, 4 Cir., 205 F.2d 267; Virginian Ry. Co. v. Armentrout, 4 Cir., 166 F.2d 400; Schuerholz v. Roach, 4 Cir., 58 F.2d 32, 34, certiorari denied 287 U.S. 623, 53 S. Ct. 78, 77 L.Ed. 541; Dimick v. Schiedt, 293 U.S. 474, 486, 55 S.Ct. 296, 79 L.Ed. 603; Brabham v. State of Mississippi, 5 Cir., 96 F.2d 210, 213–214. It was error, therefore, to order a new trial on the issue of damages and submit that issue just as though breach of contract and right to recover for destruction of business had been established, without reference to the rule of Hadley v. Baxendale, 9 Exch. 341, 156 Eng.Rep. 145, or the duty of an aggrieved party to mitigate damages. We need not go into this, however, since the Court is of opinion that defendant is entitled to judgment, notwithstanding the verdict.

The judgment appealed from will accordingly be reversed and the case will be remanded with direction to enter judgment for defendants. As defendants have printed more than twice as much matter as was necessary in the appendix to their brief in violation of our rule 10, only half the cost of printing the appendix will be taxed as costs on the appeal. Mutual Life Ins. Co. of New York v. Blodgett, 4 Cir., 126 F.2d 273, 279; Pickett v. Aglinsky, 4 Cir., 110 F.2d 628, 632; United States Galvanizing & Plating Equipment Corp. v. Hanson-Van Winkle-Munning Co., 4 Cir., 104 F.2d 856, 863.

Reversed.