172 F.Supp. 354 (1959)
STRUCTURAL STEEL & ORNAMENTAL IRON ASSOCIATION OF NEW JERSEY, INC., and Schacht Steel Construction, Inc., Plaintiffs,
v.
SHOPMENS LOCAL UNION NO. 545 OF INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, Defendant.
Civ. A. No. 236-58.
United States District Court D. New Jersey.
April 16, 1959.
Supplemental Opinion May 5, 1959.
*355 *356 Leonard Estrin, Newark, N. J., for plaintiffs.
Fox & Schackner, Newark, N. J., for defendant, by Donal C. Fox, and David Schackner, Newark, N. J.
WORTENDYKE, District Judge.
Plaintiff, Schacht Steel Construction, Inc. (company), is a member of an association of employers engaged in the steel fabrication industry known as Structural Steel & Ornamental Iron Association of New Jersey, Inc. (Association). On September 15, 1957, the Association entered into a collective bargaining agreement with the defendant, Shopmens Local Union No. 545 of the International Association of Bridge, Structural and Ornamental Iron Workers (Union). The contract was applicable to all production and maintenance employees of the members of the Association, and was in force during the dispute here in question.
Plaintiffs seek the following relief under the Labor-Management Relations Act, 1947 (Act), § 301, 61 Stat. 156, 29 U.S.C.A. § 185 (1952); judgments: (1) requiring the Union to specifically perform its obligations under the contract to arbitrate a dispute between the parties which arose on February 19, 1958 and culminated in Schacht's discharge of its employee, Rouse, a member of the Union, and the strike or work stoppage which ensued in the Schacht plant, and (2) for damages alleged to have been suffered by Schacht by reason of the work stoppage.
The Union contends that the issue in dispute is not arbitrable under the terms of the contract. It therefore contends that since there was no violation of the contract by its refusal to arbitrate this issue, the contract is not specifically enforceable by this Court and that Schacht has no right to damages.
The case was tried to the Court without a jury.
Plaintiff correctly asserts that this Court has jurisdiction under § 301 of the Act. Textile Workers Union of America v. Lincoln Mills of Alabama, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed. 2d 972. The uncontroverted facts show further that plaintiff's business activities affected commerce within the meaning of § 301(b) of the Act. International Brotherhood of Electrical Workers, Local 501, A F of L v. National Labor Relations Board, 1951, 341 U.S. 694, 71 S. Ct. 954, 95 L.Ed. 1299.
The questions presented involve a construction of the collective bargaining agreement and are as follows:
*357 1. Was there an arbitrable dispute between the parties, and of what did it consist?
2. If the dispute was arbitrable, which of the parties was responsible for the failure to arbitrate?
3. Is the employer entitled to recover damages from the Union and, if so, what is the measure thereof?
The contract provides that the Union is recognized as the exclusive representative of all the company's employees for the purpose of collective bargaining with respect to rates of pay, wages, hours and other conditions of employment. However, "the management of the company's plant and the direction of its working forces, including, but not limited to, the right to establish new jobs, abolish or change existing jobs, increase or decrease the number of jobs, change materials, processes, products, equipment and operations," are rights vested exclusively in the company. The company also has "the exclusive right * * * to schedule and assign work * * * and to suspend * * * or discharge" employees for proper cause.
Wage rates are set forth in the contract for enumerated job classifications. It is provided that if the company undertakes a work operation not covered by the enumerated classifications, such work operation shall be classified and minimum wage rates established therefor by mutual agreement between the company and the Union before such operations are started.
A grievance procedure is prescribed for the settlement of disputes between the parties with final resort to arbitration if the dispute is not settled by the grievance procedure. Pending arbitration the matters in controversy are to be held in status quo, except in aggravated cases, in which event if the company discharges an employee for aggravated cause the question of aggravated cause is also to be submitted to arbitration.
The contract contains a "no strike" clause in which the Union agrees not to strike except upon refusal of the company to submit a controversy to arbitration.
On January 2, 1958 a meeting was held of representatives of company and the Union for the purpose of establishing a wage rate for the operator of an automatic electric welding machine which had recently been purchased and installed by company. This type of machine was new in the company's plant and in the industry generally throughout New Jersey. It was agreed that the machine would be operated for a ten day trial period at a temporary rate for the operator of $2.77 per hour. It was contemplated that after the trial period had expired, another meeting would be held for the purpose of fixing a permanent rate for the operator. The next meeting was not held until February 10, 1958 when it was agreed to further extend the trial period for the machine to February 17. During the trial period the machine had been operated by a maintenance employee for the purpose of adjusting or eliminating certain operational defects. On February 19, 1958, the machine was ready for production. Accordingly, that morning company's plant superintendent, Lipton, directed Rouse, a machine shop tool operator, to act as operator of the machine. Rouse informed Lipton that he could not operate the machine without a helper, and exhibited a note from McHugh, the business agent of the Union, directing Rouse to refrain from commencing operation without a helper. No previous discussion of the necessity or propriety of a helper's participation in the operation is disclosed by the evidence. Lipton informed Rouse that no helper would be provided. McHugh confirmed his insistence upon the assignment of a helper by telephone to the shop steward. McHugh further informed Lawrence Schacht, president of company, that unless a helper was assigned to the operator of the welding machine, he would call a strike. Schacht then informed Rouse that if he refused to operate the machine without a helper, there was no more work for him. Rouse responded that he would "punch out," which he did at about 9:15 *358 a. m. By 11:30 that morning, all of the members of the Union had left the plant.
Irving Bookstaber, Esq., attorney for the Association, learned of the strike that afternoon and thereupon requested that McHugh put the men back to work. McHugh refused to do so until a helper was assigned to the operation of the new machine. Bookstaber thereupon sent a telegram to the Union's International Association in St. Louis, insisting that the collective bargaining agreement covered the situation and prohibited the strike, and requested its intervention. A copy was sent to McHugh, who informed Bookstaber that the men would remain out nevertheless. The next day Bookstaber and McHugh met and McHugh agreed to return the men to work the following morning, February 21, but none of the merits of the controversy were discussed. Thus production in the company's plant was suspended for at least one and one-half working days. At the next meeting, on February 24, Bookstaber demanded that there be submitted to arbitration the matter of the wage rate for the operator of the machine, the question whether a helper should be assigned to its operation, and the amount of damages suffered by the employer in consequence of the work stoppage. McHugh, however, refused arbitration of the wage rate of the operator of the machine and of the use of a helper in its operation, and requested that the company's damage claim be submitted in writing. Bookstaber refused the latter request and announced that suit would be instituted, which was done on February 25, 1958.
When McHugh reported the calling of the strike to the president of the Union, the latter expressed disapproval of the strike and directed McHugh to call the men back to work. However, I find that prior to that action, the Union at all times permitted McHugh to act for it until he was requested to call the men back to the job. I find that throughout the meetings above referred to McHugh was held out to the company as clothed with authority to act as the agent of the Union and that the strike or walk-out, as well as the return of the men to the job, were upon his instructions and instigation, and therefore chargeable to the Union pursuant to §§ 301(b) and 2(13) of the Act, supra. Cf. United Construction Workers v. Haislip Baking Co., 4 Cir., 1955, 223 F.2d 872, certiorari denied 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754.
The use of the automatic welding machine underlying this inter-party conflict was not in contemplation when the job classifications set forth in the collective bargaining agreement were adopted. Pursuant to the contract the classification of this job and its minimum wage rate were to be established by mutual agreement of the parties. However, the basis of the controversy here is not the classification and wage rate of this job, because neither Rouse nor his Union objected to that work assignment or the wage rate. The dispute precipitating the subsequent acts of the parties concerned was the necessity and/or propriety of employing the services of a helper on the machine. Whether this dispute is arbitrable under the contract is the issue presented. "[T]he question of whether an issue is an arbitrable one under a contract of arbitration is a legal question for the Court rather than for the arbitrator in the absence of a contract giving the arbitrator such jurisdiction." International Union, United Automobile Aircraft v. Benton Harbor Malleable Industries, 6 Cir., 1957, 242 F.2d 536, 539-540, certiorari denied 355 U.S. 814, 78 S.Ct. 15, 2 L.Ed.2d 31. The contract here does not confer such jurisdiction upon the arbitrator to decide the arbitrability of disputes.
The controlling intention of the Association and of the Union in their agreement was the achievement of industrial peace and the avoidance of interruptions in production. The grievance and arbitration procedures were expressly recognized by the parties as "adequate to provide a fair and final determination of all grievances arising under the terms of [the] contract." Implicit in the agreement is a recognition of the policy of the *359 Act, § 1, 29 U.S.C.A. § 151, "To eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining * * *."
Under the contract the right of the company to direct its working force, including the right to establish new jobs, was reserved to it. By the actions of its agent, McHugh, the Union apparently disagreed with the exercise of that right. Whether a helper should be assigned to the operator of the machine was, therefore, a dispute or matter in difference between the company, its employee, and the latter's Union and, therefore, susceptible of settlement by way of the grievance procedure or arbitration. However, the issue of arbitrability was not raised by the parties until after the men had been returned to work, when Bookstaber requested and McHugh refused arbitration. The helper dispute was arbitrable, but not arbitrated. Pursuant to the contract the status quo should have been maintained pending disposition by arbitration. However, the company apparently determined that Rouse's refusal, by direction of the Union's representative, to operate the machine without a helper, was an aggravated cause for discharging Rouse summarily. The Union, by its subsequent action of sending its men out of the plant, evidently took issue upon the question whether the cause was aggravated. Thus both the question of the aggravated cause for the discharge, and the dispute or controversy respecting a helper became arbitrable by the expressed provisions of the agreement summarized supra. Lodge No. 12, Dist. No. 37, International Association of Machinists v. Cameron Iron Works, Inc., 5 Cir., 1958, 257 F.2d 467, certiorari denied 358 U.S. 880, 79 S.Ct. 120, 3 L.Ed.2d 110.
I am called upon to apply Federal substantive law to this question. Textile Workers Union of America v. Lincoln Mills, supra. The general rule is succinctly stated in Lodge No. 12, Dist. No. 37, International Association of Machinists v. Cameron Iron Works, Inc., supra, as follows: "A dispute between labor and management is arbitrable where the dispute is specifically contracted to be arbitrable or generally where the contract expresses a broad arbitration policy, i. e., a general arbitration clause; but controversies are not arbitrable where the controversy in question is specifically excluded, where because of a listing of many arbitrable incidences the instant controversy is impliedly excluded, and where the controversy or grievance concerns violation of a `no strike clause'." Id. 257 F.2d at page 471. In the case here the dispute is not specifically contracted to be arbitrable. However, the contract contains a general arbitration clause covering all differences between the parties. The only limitation on this clause is that the arbitration provisions shall not qualify or make subject to change any term or condition of employment specifically covered by the agreement, nor apply to any dispute respecting the provisions of any proposed new agreement between the parties. There is no express exclusion of this controversy from the contract nor any list of arbitrable instances from which it could be implied that the controversy is to be excluded.
Defendant argues that the controversy as to a helper for Rouse was not such as was arbitrable under the provisions of the contract. It relies on the provision in the section setting forth the job classifications that such work operations as are not covered by the classifications shall be classified and minimum wage rates set by mutual agreement of the parties. However, a job classification and minimum wage for all helpers assigned to assist all higher classified grades is established in the contract. Thus the Union's argument that there should then have been a mutual agreement, not arbitration, between the parties as to the job classification and wage of the helper is without merit. Moreover, that argument must also fail since the parties had to initially determine whether the job of helper was to exist at all before it could *360 be classified or the wage rate set. As stated, the company had the exclusive right under the contract to direct its employees and to establish new jobs. Upon the determination of Rouse or the Union that a helper was necessary for the operation of the machine, this would have been a difference between the parties susceptible of resolution through the grievance and arbitration procedures.
Defendant's reliance on Industrial Trades Union of America v. Woonsocket Dyeing Co., D.C.R.I.1954, 122 F.Supp. 872 is misplaced. In that case the court found the contract enumerated disagreements subject to arbitration and did not include the controversy there in issue. There being no general arbitration clause applicable, it was held that the controversy was not arbitrable. Such is not the situation here.
Having determined that there existed between the parties an arbitrable dispute respecting the necessity or propriety of assigning a helper to the operation of the automatic electric welding machine, we now seek to determine which of the parties was responsible for the failure to arbitrate the question. The contract recognized that the company had the exclusive right to change equipment and to assign work to be performed, and to discharge employees for proper cause. Rouse was directed to operate the new welding machine without a helper. This Rouse, by direction of the Union's business agent, refused to do. His refusal constituted proper cause for his discharge. If Rouse and his Union considered the discharge without proper cause, the grievance and arbitration provisions of the contract were available for their invocation. Instead of abiding by these terms of the agreement, the Union called the strike, without affording the company any opportunity to request arbitration. The Union must bear the sole responsibility for its breach and assume the consequences thereof.
The company's second prayer for relief is for damages resulting from breach of the no-strike clause by the Union. The complaint requests that if specific performance is granted directing arbitration and if the question of damages is included in such questions to be settled by arbitration, then this demand is withdrawn. Plaintiffs presented evidence tending to show the measure of their damages resulting from the work stoppage. I find that the contract between the parties did not expressly contemplate that such issue of damages was a dispute or controversy to be settled by grievance and arbitration procedures. Further, since this issue concerns a violation of the no-strike clause it is not a grievance referable to arbitration. International Union, United Automobile Workers v. Benton Harbor Malleable Industries, supra; Markel Electric Products, Inc. v. United Electrical Radio & Mach. Workers, 2 Cir., 1953, 202 F.2d 435.
As I have found that the Union breached the contract when it induced the work stoppage, as the trier of the fact I shall determine the amount of damages to which the company is entitled. Shirley-Herman Co. Inc. v. International Hod Carriers, Bldg. & Common Laborers Union, Local No. 210, 2 Cir., 1950, 182 F.2d 806; United Electrical Radio & Mach. Workers of America v. Oliver Corp., 8 Cir., 1953, 205 F.2d 376; International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America Local Union No. 25, AFL v. W. L. Mead, Inc., 1 Cir., 1956, 230 F.2d 576.
At the time the work stoppage occurred, company was under contract with Apollo Steel Company of Pittsburgh, Pennsylvania, for the furnishing, fabrication and erection of the structural steel for the Monticello Raceway in New York State. That contract provided that if the work should be substantially completed by April 15, 1958, company should receive a bonus of $2,000 for each day the job was substantially completed before that date. It further provided that company would be subject to a penalty of $1,000 a day for each day after April 15 that the job was not substantially completed. The contract then stated:

*361 "Loss of time due to causes beyond our control, such as fire, strike, war, governmental allocations, etc., including the above but not limited to same, shall be added to our completion date before any penalties will be invoked.
"If, in any one week, excluding Sunday, namely Monday to Saturday inclusive, the erector cannot work five days due to inclement weather or job site conditions, the completion date of April 15th shall be extended the number of working days equal to this delay.
"An equal number of working days shall be added to the April 15th completion date and the penalty and bonus shall be calculated from this new date. The above clause is not intended to qualify or change the previous clause of delays due to causes beyond our control."
Company claims that by reason of the work stoppage it was deprived of the opportunity of substantially completing the contract job for an equivalent period before April 15, 1958, and that consequently, it lost a two-day bonus amounting to $4,000. In support of this contention, the company argues that the period of the strike should be added to the completion date and that if such be done, it would be entitled to its bonus even if it did not substantially complete the contract job by April 15th. However, a reading of the above contract terms indicates extensions of time due to strikes affected only the penalty provision. Only in the case of inclement weather or job site conditions was the completion date extended for purposes of the bonus. A copy of company's bill against Apollo Steel Company for work performed under the contract included in the charge a seven-day bonus at $2,000, amounting to $14,000. Although the bill is dated August 20, 1958, it contains no statement of the date upon which company's work under the contract was substantially completed. Lawrence Schacht testified that the Monticello Raceway job was completed early in April, 1958. He testified that the work stoppage which commenced on February 19, 1958 caused his company to lose three (?) days' bonus, but it had been stipulated between the parties that not more than two days' bonus was sought by the plaintiff on this account. Schacht's treasurer, Stone, testified that the Raceway job was finished seven days ahead of schedule, after adjustment of time lost in the field because of weather conditions. He also testified that Lawrence Schacht had unsuccessfully attempted to obtain an allowance of an additional two and a half days' bonus. Upon the evidence presented to me, I am not persuaded that the plaintiff has discharged its burden of proof in this regard. There is no proof that the contract was substantially completed before April 15. The contract with Apollo provided that no bonus would be paid after April 15 unless the contract were delayed by reason of weather or job site conditions making completion impossible. Company would not have been entitled to a bonus under the contract after April 15 even assuming they would have finished two days earlier than they actually did. Apparently Apollo construed the contract in this manner by their disallowance of Schacht's additional claim of bonus. I therefore disallow any damages predicated upon the claim of loss of bonus payments.
In addition, the company claims it was necessarily subjected to continuing charges for general overhead expense during the strike, but was deprived by the work stoppage of production which afforded a partial offset to such overhead costs. Company put in evidence a document entitled "Statement of Income, Profit & Loss for Nine Months Ended September 30, 1958" together with an accompanying document entitled "Cost of Sales for Nine Months Ended September 30, 1958." The evidence offered in support of this aspect of the damage claim was admitted upon the general principles enunciated in United Electrical Radio & Mach. Workers of America v. Oliver Corp., supra. In discussing the relation *362 of the company's standby expense to the work stoppage resulting from the strike in that case, the court stated:
"Overhead expense is the necessary cost incurred by a company in its operations which cannot be easily identified with any individual product and which by accepted cost accounting procedures is spread over or allocated to the productive labor, which is labor performed in the processing of the company's products. Such expenses do not fluctuate directly with plant operations. They are expenses necessary to keep the company on a going concern basis and are based upon the company's production which is planned for a year in advance. They are constant regardless of fluctuations in plant operations. When productive labor in a plant is reduced for any period to less than the normal, the company sustains a loss in the expenditure of necessary overhead for which it receives no production." Id. 205 F.2d at page 387.
See also, as to the subject of overhead cost accounting in comparable damage actions, Gordon Form Lathe Co. v. Ford Motor Co., 6 Cir., 1943, 133 F.2d 487, 500, affirmed 320 U.S. 714, 64 S.Ct. 257, 88 L.Ed. 419; and Pacific Portland Cement Co. v. Food Machinery & Chemical Corp., 9 Cir., 1949, 178 F.2d 541.
Company computed its overhead by adding together $291,692.59, the total general and administrative expenses of the company for the first nine months of the year 1958, and $279,418.08, the total operating expenses for the same period. Dividing this sum by 160 (the number of working days during the nine months' period) gave a quotient of $3,570 as the daily overhead. Included in the general and administrative expenses are items of $10,000 for contributions, $8,408.71 for travel and entertainment, and $2,535.29 representing miscellaneous. These I disallow, thus reducing the general and administrative expense chargeable here to $270,748.59. Likewise, I disallow a figure of $2,640.24, representing miscellaneous, from operating expenses, thus reducing that total to $276,777.84. Dividing the sum of these two figures by 160 gives a figure of $3,422.04 daily overhead, which multiplied by one and one-half days yields a total of $5,133.06. I award the latter amount to the plaintiff company as damages against the Union.
This opinion shall constitute my findings of fact and conclusions of law as required in this case by the provisions of Fed.Rules Civ.Proc. Rule 52, 28 U.S.C.A. An order may be presented in accordance with the views hereinabove expressed.

Supplemental Opinion
In my opinion in this case, filed April 16, 1959, for the purpose of computing the plaintiff's loss with respect to the item of overhead, I used as a divisor the figure of 160 as the number of working days during the period January 1 through September 30, 1958. This figure was taken from the testimony of the witness Schacht. Since the filing of my opinion counsel has brought to my attention that the witness McHugh testified that during the same period there were 189 working days in addition to several Saturdays upon which work was performed. For the purpose of reflecting this variance, and by stipulation of counsel, the figure 180 will be adopted as the divisor for the purpose of the calculation aforesaid, which requires a modification of my calculated daily overhead of $3,422.04 to a daily overhead of $3,041.80, thereby yielding a total item of damage on account of the claim based upon overhead of $4,562.70. My opinion of April 16, 1959 is therefore amended accordingly and judgment will be entered in the amount last mentioned.