582 F.2d 1346
 99 L.R.R.M. (BNA) 2520, 84 Lab.Cas. P 10,843
 CARBON FUEL COMPANY, Appellee,
v.
UNITED MINE WORKERS OF AMERICA, District No. 17, United Mine
Workers of America, Local Union No. 6572, United Mine
Workers of America, Local Union No. 7626, United Mine
Workers of America, and Local Union No. 2236, United Mine
Workers of America, Appellants.
 No. 77-1422.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 7, 1977.
Decided Sept. 21, 1978.
 
 James M. Haviland, Washington, D. C. (Harry John Taylor, E. Gail Falk, Charleston, W. Va., Harrison Combs, Washington, D. C., on brief), for appellants.
 David D. Johnson, Charleston, W. Va. (Forrest H. Roles, R. Edison Hill, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., on brief), for appellee.
 Before HAYNSWORTH, Chief Judge, BUTZNER, Circuit Judge, and FIELD, Senior Circuit Judge.
 FIELD, Senior Circuit Judge:
 
 
 1
 Carbon Fuel Company filed an action under Section 301 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 185, against three local unions of the United Mine Workers of America (UMWA)[1], UMWA District 17, and the International Union, seeking injunctive relief and damages incident to forty-eight work stoppages which occurred during the years 1969 through 1973 at various mines of Carbon Fuel in southern West Virginia. Carbon Fuel and UMWA were parties to a collective bargaining contract known as the "National Bituminous Coal Wage Agreement of 1971", which contract became effective on November 12, 1971, but which expired prior to the trial of this case, leaving only the question of damages to be tried. The issues at trial were whether the alleged stoppages had occurred, whether they were actionable, and the damages allocable to each actionable stoppage. Under the agreed procedure, the jury considered the evidence and returned a separate verdict for each stoppage. Verdicts were returned by the jury aggregating $206,547.80 against the International Union, $242,130.80 against District 17, and $722,347.43 against the three local Unions. Judgments were entered pursuant to the verdicts with respect to each stoppage, and all of the UMWA defendants have appealed.
 
 
 2
 The case came on for trial after our decision in Armco Steel Corp. v. UMWA, 505 F.2d 1129, Cert. denied 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975), but prior to the Supreme Court's decision in Buffalo Forge v. Steel Workers, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), and was tried and evidence presented on the basis of Armco. The district court, relying upon Armco, ruled as a matter of law that each of the stoppages was violative of the collective bargaining agreement. Seventeen of the forty-eight stoppages were "sympathy strikes",[2] and Carbon Fuel now concedes that in the light of Buffalo Forge it was error for the court to direct the jury that these seventeen stoppages violated the collective bargaining agreement. Despite this concession, however, Carbon Fuel contends that its judgments with respect to these stoppages should not be vacated and dismissed, but rather that they should be remanded to the district court with directions that they be referred to arbitration upon the issue of whether the action of the UMWA members in refusing to cross picketlines or in engaging in the various work stoppages violated the collective bargaining agreement. Carbon Fuel suggests that upon receipt of the arbitrators' decision the district court can then either reinstate or finally vacate the judgments as to these stoppages.
 
 
 3
 In our opinion, the answer to this contention of Carbon Fuel is found in Buffalo Forge itself. In that case the arbitrability of the question of whether the production employees were required to cross the picketline was conceded, 428 U.S., Supra, at 410, 96 S.Ct. 3141, due to the fact that the agreement contained an express no-strike clause. The Court made it clear, however, that in the absence of such a clause, a sympathy strike is neither actionable nor arbitrable;
 
 
 4
 "The strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of its bargain. Thus, had the contract not contained a no-strike clause or had the clause expressly excluded sympathy strikes, there would have been no possible basis for implying from the existence of an arbitration clause a promise not to strike that could have been violated by the sympathy strike in this case." (Emphasis supplied).
 
 
 5
 428 U.S., Supra, at 408, 96 S.Ct. at 3148. This statement of the Court is clarified by its observation in footnote 10, Id., that the courts of appeals, including our court in Armco, who had "assumed that a mandatory arbitration clause implies a commitment not to engage in sympathy strikes," were wrong.
 
 
 6
 Our conclusion on this point is in accord with decisions of the Third and Sixth Circuits. In United States Steel Corp. v. United Mine Workers, 548 F.2d 67 (3 Cir. 1976), the court stated:"Had the contract in the instant case contained a no-strike clause, the issue whether the sympathy strike violated the union's no-strike undertaking might have been arbitrable. In the absence of a no-strike clause, however, Buffalo Forge establishes that there is 'no possible basis for implying from the existence of an arbitration clause a promise not to strike that could have been violated by the sympathy strike' in this case."
 
 
 7
 Id. at 73. The court further observed that "(w)hat Buffalo Forge establishes regarding the arbitrability of sympathy strikes is as applicable to this particular suit for monetary damages as it is to a request for injunctive relief." Id. at 72. Similarly, in Southern Ohio Coal Co. v. U. M. Wkrs. of America, 551 F.2d 695 (6 Cir. 1977), the court found that the absence of a no-strike clause was fatal to the company's claim of arbitrability, stating:
 
 
 8
 "The Bituminous Coal Wage Agreement of 1974 does not contain an express no-strike clause so the issue of the union's right to refuse to cross a picketline is not even arguably arbitrable."
 
 
 9
 Id. at 705.
 
 
 10
 We do not find our recent decision in Cedar Coal Co. v. United Mine Wkrs. of America, 560 F.2d 1153 (1977), at odds with our conclusion on this point. In Cedar Coal we recognized that there was a question as to whether the object of the strike was to compel the company to concede an arbitrable issue and addressed ourselves only to the denial of injunctive relief pending arbitration. Upon the record before us we discern no such issue in the present case and, accordingly, the judgments based upon these seventeen stoppages are reversed.
 
 
 11
 The remaining thirty-one work stoppages were concededly precipitated by disputes between members of the UMWA and Carbon Fuel which were subject to the arbitration provisions of the collective bargaining agreement. However, all of these stoppages were properly characterized as wildcat strikes and, accordingly, it is necessary to consider the responsibility, if any, of the several defendants for the resultant damages. The district court directed verdicts of liability against the Locals for the majority of these strikes on the basis of the "mass action" theory of responsibility. The genesis of this theory is generally attributed to Judge Goldsborough's decision in United States v. International Union, U. M. W. of A., 77 F.Supp. 563 (D.C.1948), where he stated "that as long as a union is functioning as a union it must be held responsible for the mass action of its members." Id. at 566. Over the years this theory of responsibility has been refined and applied by a number of courts,[3] and its rationale was recently stated by the Third Circuit in Eazor Exp., Inc. v. International Bro. of Team., 520 F.2d 951 (1975), as follows:
 
 
 12
 "When all the members of a union employed by a given employer engage in a concerted strike not formally authorized by the union, as happened here, many courts hold the union responsible on the theory that mass action by union members must realistically be regarded as union action. The premise is that large groups of men do not act collectively without leadership and that a functioning union must be held responsible for the mass action of its members."
 
 
 13
 Id., at 963. However, responsibility for wildcat strikes under this theory will ordinarily be limited to the local union. This was recognized in U. S. Steel Corp. v. United Mine Workers of America, 534 F.2d 1063 (3 Cir. 1976):
 
 
 14
 "Consistent with theory, however, the liability must be limited to the entity whose membership acts in concert. In most cases, as here, that entity will be the local union. Thus absent a showing of complicity on the part of a larger union entity the District or International Union, for example only the local can be held liable under the mass action theory."
 
 
 15
 Id. at 1074.
 
 
 16
 In our opinion the "mass action" theory, properly applied, represents a sensible and pragmatic approach to this difficult problem in the area of labor relations. In view of the uncontradicted evidence that all of the members of the defendant Locals, including their officers, participated in the strikes, the theory was properly employed by the district court in placing responsibility upon the Locals. Accordingly, the judgments against the Locals growing out of these thirty-one work stoppages are affirmed.
 
 
 17
 In regard to District 17 and the International Union, the district court charged the jury that these defendants had the duty and responsibility to use all reasonable means to prevent or terminate the wildcat strikes, and that the failure to do so would render them liable for the work stoppages. The court further instructed the jury that the District and International could be held liable if the jury found that the Locals were acting within the scope of their authority as agents of the District and International. The defendants contend that these instructions ignored the history of the collective bargaining agreement and misconstrued its terms. Additionally, they urge that in giving such instructions the district court failed to follow the controlling precedent in this circuit, United Construction Workers v. Haislip Baking Co.,223 F.2d 872 (4th Cir. 1955).
 
 
 18
 The bargaining history which was chronicled in International U., U. M. W. of A. v. National Lab. Bd., 103 U.S.App.D.C. 207, 257 F.2d 211 (1958), discloses that as late as 1941, the contract contained an express agreement not to strike. However, following the passage of the Taft-Hartley Act, 29 U.S.C. § 141, Et seq., the 1947 agreement rescinded all "no-strike", "penalty", and "illegal suspension of work" clauses which had been contained in earlier agreements. The reason for this was to protect the union from potential law suits under Taft-Hartley. Thereafter, during the brief period from 1950 to 1952 the contract contained an express clause which required the Union to exercise its "best efforts" to prevent work stoppages. However, that provision was eliminated two years later. The bargaining history shows that the agreements from 1972 through 1977 neither imposed any "best efforts" duties on the International nor did they contain any indemnity obligation which would make the International vicariously liable for local wildcat stoppages. In instructing the jury in this fashion, the district court apparently followed Eazor Exp., Inc. v. International Bro. of Team., supra, 520 F.2d 951, and U. S. Steel v. United Mine Workers, supra, 534 F.2d 1063. In the latter case the Third Circuit stated that "(a) covenant to maintain the integrity of the contract necessarily embraces a reasonable efforts obligation to comply with the (implied) no-strike promise." Id., at 1073. In all deference, we cannot agree with this conclusion. In the light of the bargaining history, it appears to us that such an interpretation, in effect, rewrites the terms of the contract upon which the parties had agreed.[4]
 
 
 19
 The rationale of the Third Circuit in Eazor has not been generally accepted. In Southern Ohio Coal v. U. M. Wkrs., supra, 551 F.2d 695, the Sixth Circuit declined to follow Eazor, stating that "there is no authority in this circuit for the proposition that a union may be held responsible * * * for failure to use its 'best efforts' in curtailing (unauthorized strikes). On the contrary, this Court has repeatedly held that a union may only be held responsible for the authorized or ratified actions of its officers and agents." Id., at 701. Similarly, in Old Ben Coal Corp. v. Local U. No. 1487 of United Mine Wkrs., 457 F.2d 162 (1972), the Seventh Circuit referred to the bargaining history and stated:
 
 
 20
 "Implying a no-strike obligation in the 1968 agreement does not render the express abrogation of previous no-strike clauses meaningless as then Circuit Judge Stewart indicated in (Lewis v. Benedict Coal Corporation, 259 F.2d 346 (6 Cir. 1958)). By virtue of that language, the Union has preserved the right to strike with respect to all disputes not subject to settlement by other methods made exclusive by the agreement. In addition the language protects the Union from liability for spontaneous or 'wildcat' strikes which would be the kind of work stoppages subject to the settlement procedures of the agreement." (Emphasis Supplied).
 
 
 21
 Id. at 164.
 
 
 22
 The position of the Sixth and Seventh Circuits accords with our decision in Haislip which has been described as "a major case in this area."[5] In Haislip Judge Parker stated the law of this circuit clearly and unequivocally:
 
 
 23
 "What we are dealing with is, not a case where circumstantial evidence points to instigation of a strike by defendants or the agents who represented them, but a 'wild cat' strike of local origin, without anything to suggest that defendants or their agents had anything to do with bringing it about. (The representatives of UMWA) were called in to try to end the strike and get the men to go back to work, and everything that they did was directed to that end. Even if the testimony as to their advising the men to go back to work be disregarded and it be assumed that they did nothing of the sort, there is no evidence to support the view that they adopted the strike, that they encouraged it or that they prolonged it.
 
 
 24
 There is nothing in the contract making defendants liable for 'wild cat' strikes or requiring that they take any action with regard to them. This court has pointed out that employees who engage in 'wild cat' strikes lose the protection of the Fair Labor Standards Act and may be discharged by their employers with impunity for so doing. N. L. R. B. v. Draper Corporation, 4 Cir., 145 F.2d 199, 156 A.L.R. 989. We have never held, however, that there is any responsibility on the part of a union for a strike with which it has had nothing to do; and there manifestly is no such liability. If (the representatives of UMWA) had done nothing when plaintiff called on them to help get the men back to work, there would have been no liability on the part of the defendants. This being true, defendants were not rendered liable by the efforts which these men made to bring about an adjustment of the difficulty, even if they did not do everything that they might have done to that end. The question is not whether they did everything they might have done, but whether they adopted, encouraged or prolonged the continuance of the strike. There is no evidence of any sort that they did."
 
 
 25
 223 F.2d 872, 877-878.
 
 
 26
 In our opinion the present case falls squarely within the four corners of Haislip. There was no evidence presented in the district court that either the District or International Union instigated, supported, ratified, or encouraged any of the work stoppages, and under these circumstances it was error for the court to deny the motions of these defendants' for directed verdicts.
 
 
 27
 We have carefully considered the other issues raised on this appeal, and are of the opinion that the district court's conduct of the trial, including its evidentiary rulings and modified "Allen charge", fell well within the acceptable limits of judicial discretion. Accordingly, the judgments against District 17 and the International Union are vacated and remanded with directions to dismiss as to these defendants. The judgments against the Locals on the seventeen sympathy stoppages are also vacated. The remaining thirty-one judgments against the Locals are affirmed.
 
 
 28
 AFFIRMED in part; VACATED and REMANDED in part.
 
 
 
 [1]
 The local unions named as defendants were Nos. 6572, 7626, and 2236
 
 
 [2]
 None of these stoppages was in support of any "sister unions", but they did qualify as "sympathy strikes" under Buffalo Forge since they were not the result of any dispute between the Union and the company. The reasons for these stoppages ranged from political protests to intraunion disputes
 
 
 [3]
 See e. g. Vulcan Materials Co. v. United Steelworkers of America, 430 F.2d 446 (5 Cir. 1970); United Textile Workers v. Newberry Mills, Inc., 238 F.Supp. 366 (W.D.S.C.1965)
 
 
 [4]
 We also decline to follow the rationale applied in the recent case of Republic Steel Corp. v. U. M. W. of America, 570 F.2d 467 (3 Cir. 1978)
 
 
 [5]
 United States Steel Corp. v. United Mine Wkrs. of A., 519 F.2d 1249, 1253 (5 Cir. 1975)